**Affirmed as Modified, and Opinion filed March 16, 2021.**



**In The**

# Fourteenth Court of Appeals

---

**NO. 14-19-00915-CV**

---

**ETC INTRASTATE PROCUREMENT COMPANY, LLC, Appellant/Cross-Appellee**

**V.**

**JSW STEEL (USA), INC., Appellee/Cross-Appellant**

---

**On Appeal from the 344th District Court**
**Chambers County, Texas**
**Trial Court Cause No. 18DCV0752**

---

**OPINION**

In this case, we must decide whether the parties agreed to arbitrate their dispute involving the sale and delivery of pipe for an oil and gas pipeline. The answer depends on which documents, among a price quotation, purchase order, and order acknowledgment, form the parties' agreement. This scenario, although seemingly common, has not often been addressed in Texas jurisprudence. We also address whether a trial court may award postjudgment interest that was not

awarded by the arbitrator. Concluding that the trial court did not abuse its discretion in ordering the dispute to arbitration and confirming the arbitration award but erred in awarding postjudgment interest, we affirm the trial court's final judgment as modified.

## *Background*

ETC Intrastate Procurement Company, LLC constructs oil and gas pipelines. ETC sent JSW Steel (USA), Inc. a request for quotation (RFQ) for the fabrication and delivery of pipe for an oil and gas pipeline project. A timeline of major events follows:

- <u>January 30, 2018</u>: ETC emailed JSW its RFQ. The email included a list of "Applicable Attachments," including "ETC STANDARD TERMS AND CONDITIONS # 112." The terms and conditions had a clause entitled "Entire Agreement," stating:

  > This purchase order and any documents referred to therein constitute the entire agreement between the parties hereto and supersedes all prior proposals, negotiations and counterproposals. This instrument is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms thereof. No course of prior dealings between the parties shall be relevant to supplement or explain any term used in this agreement. Acceptance or acquiescence in a course or performance rendered under this agreement shall not be relevant to determine the meaning of this agreement even though the accepting or acquiescing party has knowledge of the nature of the performance and opportunity for objection.

- <u>February 1, 2018</u>: JSW emailed ETC a price quotation that stated, "Quotation is valid through close of business February 07, 2018." The price quotation included pricing, quantity, specifications, and payment terms, and stated that the final production schedule was "to be agreed upon at the time of the order placement." JSW's "Sales Policy Terms and Conditions of Sale" were attached to the email and stated:

  > The terms and conditions written on our order acceptance and

on this page constitute the entire contract between you and us (the "Contract"). All sales by us are made subject to these terms and conditions. We **expressly reject** any different or additional terms or conditions contained in any documents submitted by you. Course of dealing, course of performance and usage of trade, to the extent that they modify, add to or detract from this Contract, shall not be binding on us.

- <u>February 14, 2018</u>: ETC emailed JSW a "DRAFT purchase order," which includes a section that says, "ATTACHMENTS AS THEY APPLY TO THIS PURCHASE ORDER: ETC Std Terms & Conditions #112." These terms and conditions were not attached.

- <u>February 15, 2018</u>: ETC emailed JSW a "purchase order." Like the draft, the purchase order also includes a section that says, "ATTACHMENTS AS THEY APPLY TO THIS PURCHASE ORDER: ETC Std Terms & Conditions #112." Again, the terms and conditions were not attached.

- <u>February 16, 2018</u>: JSW emailed ETC an "Order Acknowledgement" that also includes the following comment: "ATTACHMENTS AS THEY APPLY TO THIS PURCHASE ORDER: ETC Std Terms & Conditions #112."

- <u>March 8, 2018</u>: An ETC representative emailed JSW and stated, "I failed to attached [sic] the Terms & Conditions associated with this purchase, please find them attached. All other documents are the same as those sent on 2/15/2018." The "Terms & Conditions associated with this purchase" were the same ones that had been sent to JSW with the RFQ on January 30.

JSW made the last pipe delivery on July 4, 2018. ETC contends the applicable terms and conditions required delivery by June 5, 2018. JSW contends the applicable terms and conditions allowed an estimated delivery due date. ETC paid JSW approximately $7.4 million after making a deduction for purported late delivery fees. JSW asserts that ETC still owed it nearly $1 million, plus attorney's fees and interest.

JSW commenced arbitration and filed this lawsuit to compel arbitration against ETC and its parent company Energy Transfer, LP, seeking a declaration that the parties' contract required arbitration. JSW asserted that ETC is an agent or

3

the alter ego of Energy Transfer. After a hearing, the trial court signed an order compelling arbitration.

The arbitrator concluded that JSW's terms and conditions, including an arbitration agreement, were part of the parties' agreement and awarded JSW actual damages, attorney's fees, arbitration fees, and interest "until paid or a judgment is entered" against ETC. The arbitrator denied JSW's claims against Energy Transfer. The trial court rendered judgment confirming the arbitrator's award but in addition awarded JSW postjudgment interest.

### *Discussion*

In two issues, ETC challenges the trial court's order compelling arbitration and awarding postjudgment interest. In its appeal, JSW contends the trial court erred in setting the postjudgment interest rate at 5% per annum instead of 18% per annum. We first address whether the parties were bound to arbitrate their dispute. Then we address the issues involving postjudgment interest.

### I.      Did the parties agree to arbitrate their dispute?

In its first issue, ETC contends the trial court erroneously ordered the parties to arbitrate their dispute. According to ETC, its terms and conditions control the parties' agreement and do not include an arbitration agreement. JSW asserts to the contrary that its terms and conditions apply, which include an arbitration agreement.

In the trial court, a party seeking to compel arbitration bears the burden to establish that an arbitration agreement exists and that the claims presented fall within its scope. *Nationwide Coin & Bullion Reserve, Inc. v. Thomas*, No. 14-19-00632-CV, 2020 WL 6741694, at *2 (Tex. App.—Houston [14th Dist.] Nov. 17, 2020, no pet. h.) (citing *In re Oakwood Mobile Homes, Inc.*, 987 S.W.2d 571, 573

4

(Tex. 1999) (per curiam) (orig. proceeding), *abrogated on other grounds by In re Halliburton Co.*, 80 S.W.3d 566 (Tex. 2002) (orig. proceeding)). Whether an arbitration clause is enforceable is subject to de novo review. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009). But whether the parties reached an agreement to arbitrate can involve questions of fact. *Compare Morgan v. Bronze Queen Mgt. Co.*, 474 S.W.3d 701, 706–07 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("The parties dispute whether there was acceptance of an offer creating an implied agreement to arbitrate . . . . Whether the parties reached an agreement is a question of fact."), *with Read v. Sibo*, No. 14-18-00106-CV, 2019 WL 2536573, at *2–3 (Tex. App.—Houston [14th Dist.] June 20, 2019, pet. denied) (mem. op.) (involving whether the parties intended to agree to arbitrate based on the agreement's terms within the document itself). We review a trial court's decision to grant or deny a motion to compel arbitration under an abuse of discretion standard, deferring to the trial court's factual determinations if they are supported by evidence and reviewing legal determinations de novo.[1] *Rodriguez v. Tex. Leaguer Brewing Co.*, 586 S.W.3d 423, 427 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) (citing *In re Labatt Food Serv.*, 279 S.W.3d at 643); *see also Read*, 2019 WL 2536573, at *2.

### A. Trial court's comments after the case went to arbitration are immaterial.

The trial judge held a hearing on JSW's motion to confirm the arbitration award. During the hearing, the trial judge stated that he had sent the case to arbitration because the case was too complicated for a jury, as follows: "[I]n all due respect to our jury system, by the time the jury heard all this information, I'm not sure they would have come to a decision. That's actually why I went with the

---

[1] The parties disagree on the proper standard of review, but our standard of review is well established.

5

arbitration, to be honest with you." ETC argues this statement shows the trial court granted the motion compelling arbitration "for an illegitimate reason." However, the trial court did not make findings of fact and conclusions of law in support of its order compelling arbitration. In such cases, the judgment of the trial court implies all necessary fact findings in support of the judgment, and we must affirm the judgment if it can be upheld on any legal theory that finds support in the evidence. *See id.* at 432. The statement the trial judge made after the case was arbitrated is immaterial.

**B.      ETC accepted JSW's offer.**

ETC argues that its purchase order was the offer and JSW's order acknowledgement was the acceptance forming the parties' contract, so that ETC's terms and conditions apply. JSW contends that its price quotation was the offer and ETC's purchase order was the acceptance, so that JSW's terms and conditions apply. The parties agree that Texas's version of the Uniform Commercial Code applies to the parties' agreement because it involves the sale of goods. *See Summit Glob. Contractors, Inc. v. Enbridge Energy, Ltd. P'ship*, 594 S.W.3d 693, 700 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citing Tex. Bus. & Com. Code § 2.102). When the UCC applies, we do not consider common law principles that conflict with the UCC. *See Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n*, 462 S.W.3d 128, 138 (Tex. App.—Houston [1st Dist.] 2015, no pet.). To the extent that there is no conflict, common law principles complement the UCC. *Id.* (citing Tex. Bus. & Com. Code § 1.103(b) ("Unless displaced by the particular provisions of this title, the principles of law and equity . . . shall supplement its provisions.")).

Formation of a contract under the UCC occurs "in any manner sufficient to show agreement," and "[a]n agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined." Tex. Bus.

& Com. Code § 2.204(a), (b). Even though one or more terms of the contract are left open, the contract will not fail for indefiniteness so long as the parties intended to make a contract and "there is a reasonably certain basis for giving an appropriate remedy." *Id*. § 2.204(c). Unless otherwise unambiguously indicated, we construe an offer to make a contract as inviting acceptance "in any manner and by any medium reasonable in the circumstances." *Id*. § 2.206(a)(1). Even if it includes different or additional terms from those offered, a definite and seasonable expression of acceptance or written confirmation sent within a reasonable time operates as an acceptance, unless the offeror makes acceptance conditional on assent to different or other terms. *Id*. § 2.207(a).

An offer is an act that leads the offeree reasonably to believe that assent will conclude the deal. *Axelson, Inc. v. McEvoy-Willis, a Div. of Smith Int'l (N. Sea), Ltd.*, 7 F.3d 1230, 1232-33 (5th Cir. 1993). A sufficiently detailed price quotation can be an offer. *See, e.g.*, *J.D. Fields & Co. v. U.S. Steel Int'l, Inc.*, 426 Fed. App'x 271, 278 (5th Cir. 2011); *Axelson, Inc.*, 7 F.3d at 1232; *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 803 (Tex. 1991). Accordingly, a purchase order sent in response to a price quotation can be an acceptance. *See Summit Glob. Contractors, Inc.*, 594 S.W.3d at 701.

JSW's price quotation email included pricing, quantity, specifications, and payment terms, stated that the final production schedule was "to be agreed upon at the time of the order placement," and was e-signed by JSW's pipe sales manager. We conclude these terms were sufficiently detailed to qualify as an offer. *See, e.g.*, *Tubelite*, 819 S.W.2d at 804 ("Tubelite's quotation contained the terms of the offer, including a detailed list of materials to be supplied, specifications and a total price."); *Summit Glob. Contractors, Inc.*, 594 S.W.3d at 701 ("The parties agree that the purchase orders incorporated Summit's bid terms. We conclude that

7

Summit's bid proposals are offers and the purchase orders are acceptances under the UCC."); *Am. Bus. Info., Inc. v. Classic Uniforms, Inc.*, No. 04-01-00199-CV, 2002 WL 197936, at \*2 (Tex. App.—San Antonio Feb. 6, 2002, no pet.) (not designated for publication) ("Similar to the quotation at issue in *Tubelite*, the proposal . . . provided that the quotation was effective for thirty days after the date of the invoice; and it was 'signed' by [seller's] authorized agent. It was therefore a firm offer."). If ETC had accepted the price quotation as is, the acceptance would have concluded the deal. *See Axelson, Inc.*, 7 F.3d at 1233. Even though the production schedule was left open, this would not disqualify the price quotation as an offer under the UCC. *See* Tex. Bus. & Com. Code § 2.204(c).

We turn to whether ETC accepted the offer, thus forming an agreement. JSW's price quotation invited acceptance "through close of business" February 7, 2018, so the offer expired by its own terms before ETC sent its purchase order eight days later. Given the expiration of the offer, we must decide whether ETC's purchase order constituted "[a] definite and seasonable expression of acceptance or a written confirmation . . . sent within a reasonable time." *Id*. § 2.207(a). Texas courts have not addressed whether a purchase order sent after the expiration of a price quotation's validity period can operate as a seasonable expression of acceptance under the UCC, although case law from the Fifth Circuit is instructive on this issue.

In one instance, the Fifth Circuit held that when a price quotation's validity period lapsed before acceptance, the district court "did not err in finding that it was unreasonable as a matter of law for [the buyer] to believe that the price quotation was an offer." *J.D. Fields & Co.*, 426 Fed. App'x at 277-78. In that case, the seller, U.S. Steel International, Inc., emailed a price quotation to the buyer, J.D. Fields & Co. *Id*. at 277. Five days later, J.D. Fields faxed U.S. Steel a purchase order with

8

different terms. *Id*. Neither the quote nor the purchase order met U.S. Steel's minimum order requirement. *Id*. J.D. Fields notified U.S. Steel that it was "looking into" increasing its order to reach the minimum. *Id*. The record did not reflect any evidence that the parties ever reached an agreement as to quantity. *Id*. Moreover, U.S. Steel repeatedly informed J.D. Fields that it needed to submit a revised purchase order to reach an agreement. *Id*. at 277-78. J.D. Fields never did so. *Id*. at 278. The Fifth Circuit affirmed the trial court's grant of summary judgment on the basis that the district court reasonably concluded that the price quotation was not an offer. *Id*.

On the other hand, the Fifth Circuit has held that ongoing negotiations may extend the timeframe for definite and seasonable acceptance outside the validity period of a price quotation when the negotiations show that the terms of the quotation, after being modified by negotiation, were still subject to being accepted. *Axelson, Inc.*, 7 F.3d at 1233. The *Axelson* court noted, "Understanding how the parties arrived at a contract must turn on an examination of the parties' negotiations and conduct." *Id*. at 1231. Axelson sent McEvoy-Willis a price quotation on July 12, 1984 that was valid for sixty days. *Id*. The validity of the quotation was extended until December 31. *Id*. That deadline also passed. *Id*. On March 7, 1985, McEvoy-Willis sent Axelson a "telex of intent for commencement of [its] purchase order" with the purchase order "to follow in due course." *Id*. Axelson began performance, and McEvoy-Willis followed up by sending its purchase order on June 4. *Id*. The Fifth Circuit concluded:

> [T]he . . . quotation . . . , which contained all material terms, lapsed on December 31, but ongoing negotiations between the parties show that the terms of the quotation, after being modified by negotiation, were still subject to McEvoy's acceptance. If at any point in the negotiations McEvoy had sent a telex saying, "We accept," the contract would have been concluded on the terms as negotiated to that

9

point. McEvoy's telex of intent was the definite and seasonable acceptance and perfected the contract.

*Id*. at 1233.[2]

We think this case is like *Axelson*. The original price quotation contained all material terms, except for the production schedule, which JSW expressly noted the parties "will mutually agree on." The following transpired during the parties' ongoing negotiations over a five-day period:

- JSW provided a "breakdown for the pipe" and a revised price for addition of "after receipt of order" (ARO) payment terms.

- JSW provided the price for double jointing and new freight charges.[3]

- JSW encouraged ETC to conclude the deal by placing a purchase order because JSW received another purchase order that would extend ETC's delivery date unless ETC was "still plan[ning] on placing the PO with" JSW.

- The parties began negotiating the delivery schedule in accordance with the price quotation.

- ETC sent JSW a draft purchase order suggesting a delivery date.

- ETC sent JSW a final purchase order, also specifying that the parties "will mutually agree on the production schedule."

At any time during this negotiation process, ETC could have accepted, and the acceptance would have concluded the parties' deal "on the terms as negotiated to that point." *See id*. ETC's purchase order accordingly "was the definite and seasonable acceptance and perfected the contract." *See id*.; *see also Stelluti Kerr, L.L.C. v. Mapei Corp.*, 703 Fed. Appx. 214, 224 (5th Cir. 2017) (holding price quotation was an offer because, among other things, it "was not a generalized

---

[2] *Cf. Paul Mueller Co. v. Alcon Labs., Inc.*, 993 S.W.2d 851, 855 (Tex. App.—Fort Worth 1999, no pet.) (holding "[u]nder the circumstances of this case," when price quotation expired and seller subsequently "sent two more quotations" with "different sales terms," buyer had not accepted the terms of the original price quotation).

[3] ETC refers to this communication as the "February 9, 2018 proposal e-mail."

quote sent to a number of potential customers" and it "was prepared and revised twice specifically for [the buyer], at [the buyer's] request").

ETC argues that *Axelson* is distinguishable because in that case the purchaser accepted the quote within a "period of express validity." This argument is not persuasive. The *Axelson* court expressly acknowledged that the last valid date for the quote expired December 31, 1984, and the offer was accepted in March the following year. 7 F.3d at 1233. The court noted that the district court concluded "that the original quotation was an offer whose expiration date was extended orally, and that both parties treated the quotation as a valid offer." *Id*. at 1232. Those facts are not materially different from the facts presented here. The record supports implied findings from the trial court that the original quotation was extended by the parties' negotiations and both parties treated the quotation as a valid offer. *See Rodriguez*, 586 S.W.3d at 432.

ETC also cites *J.D. Fields & Co., Inc. v. Shoring Engineers*, 391 F. Supp. 3d 698 (S.D. Tex. 2019), in support of its argument that JSW's price quote was not an offer. But in that case, the "quote itself state[d] that it [was] 'non-binding' and that '[o]nly a fully executed purchase agreement [would] be binding.'" *Id*. at 703. Also, email correspondence made clear that a purchase order was necessary to conclude the deal, so that no one could have reasonably believed that accepting the price quote would form a contract. *Id*. at 703-04. Here, ETC contends that no reasonable person would think the price quote could be an offer because the parties were still negotiating the production schedule, amount of pipe, and pipe specifications. But under the UCC, "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Tex. Bus. & Com. Code § 2.204(c). The amount of pipe and some of the specifications changed

11

during the negotiation process, and JSW warned ETC that JSW received another order that would extend ETC's delivery date if ETC did not send a purchase order quickly. That does not mean the price quotation was not an offer. In fact, ETC sent the purchase order to JSW three days later.

ETC further contends that its RFQ ensured that its terms and conditions applied and "any different terms proposed by JSW would be ineffective unless accepted by ETC" because ETC's terms and conditions were an "applicable attachment" to the RFQ and included the following clause:

> Any acceptance of this purchase order is limited to acceptance of the express terms contained on the face and back hereof. If additional or different terms are proposed by Seller their response shall constitute a counter offer which shall not be effective unless accepted by the Purchaser. If not so accepted, the terms of this purchase order shall prevail.

The problem with this argument lies in the timeline. The parties agree that the RFQ is not an offer or a purchase order.[4] JSW sent its price quotation in response to the RFQ along with its own terms and conditions that expressly rejected any other other terms and conditions: "The terms and conditions written on our order acceptance and on this page constitute the entire contract between you and us. . . . We **expressly reject** any different or additional terms or conditions contained in any documents submitted by you." Thus, JSW expressly limited acceptance of its price quotation to the terms and conditions in the price quotation. *See id*. § 2.207(b)(1). When ETC emailed the purchase order to JSW, ETC listed

---

[4] ETC argues that JSW's terms and conditions purport to accept a prior order as follows: "The terms and conditions written on our order *acceptance* and on this page constitute the entire contract between you and us" (emphasis added). This language in JSW's terms and conditions is consistent with JSW's anticipating ETC's order in response to the price quotation. Given that both parties agree the RFQ is not an offer, we do not agree that JSW's terms and conditions are aimed at accepting a prior order. Unremarkably, ETC contends that it was required to accept JSW's terms and conditions for them to become effective.

its terms and conditions as one of the "ATTACHMENTS AS THEY APPLY TO THIS PURCHASE ORDER," but ETC neither attached the terms and conditions to that email nor expressly made its order conditional on assent to its own terms and conditions. *See id*. § 2.207(a).

ETC also argues that its purchase order was a counteroffer and not an acceptance, citing *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). That case is distinguishable because it involved a dispute over whether a contract had been formed—we held there was no evidence of a meeting of the minds or mutual assent to the sale of mud pumps. *See id*. at 77. In so holding, we noted that an email exchange "chang[ed] several of the material terms of [the] offer, including" the number of items purchased, the price, and the purchaser. *Id*. at 74-75. We held that changing the material terms of the offer constituted a rejection of the original offer and a counteroffer. *Id*. The issue in *Parker Drilling* was thus whether a contract was formed at all. *Id*. at 77 ("Romfor failed to prove each of the elements necessary to establish the existence of a legally enforceable contract."). In this case, the parties undisputedly reached an agreement.

Finally, ETC asserts that JSW's order acknowledgment was the acceptance of ETC's offer. We disagree. As discussed, the price quotation was sufficiently detailed to constitute an offer. Accordingly, the contract was formed when ETC sent its purchase order to JSW. *See Am. Bus. Info., Inc.*, 2002 WL 197936, at *1-2 (holding seller's signed price quotation was a firm offer that was accepted when it was signed by buyer and faxed back to seller). The parties' contract consisted of the terms in JSW's price quotation as modified by the parties' ongoing negotiations. *See id*.; *see also Delta Brands, Inc. v. Wysong & Miles Co.*, 203 F.3d 828, 1999 WL 1240802, at *1 (5th Cir. 1999) ("[T]he characteristics of [the] price

quote compel the conclusion that it qualifies as a firm offer under the Texas UCC and Texas precedent. Also, the language of [the] purchase order compels the conclusion that it constitutes an unconditional acceptance."); *Axelson, Inc.*, 7 F.3d at 1233. Having determined that the price quotation was the offer and the purchase order was the acceptance, we turn to whether the parties agreed to arbitrate their dispute.

## C. The parties are bound by the arbitration agreement.

JSW contends that its terms and conditions, which include an arbitration agreement, are part of the parties' agreement. As discussed, JSW attached its "Terms and Conditions of Sale" to its email with the price quotation. ETC asserts that JSW was required to "expressly incorporate" its terms and conditions into its price quotation for them to be part of the parties' agreement.

JSW relies on *Wade & Sons, Inc. v. American Standard, Inc.*, 127 S.W.3d 814 (Tex. App.—San Antonio 2003, pet. denied). The facts of that case are very similar to the facts presented here. Consolidated, a mechanical contractor, requested a bid from Trane for air conditioning units for a building remodel. *Id*. at 817-18. Trane sent a bid "proposal" to Consolidated. *Id*. at 818. Consolidated then sent Trane a purchase order. *Id*. Trane asserted that its bid proposal included a document entitled "Standard Terms and Conditions." *Id*. Consolidated claimed that the terms and conditions were not attached to the proposal. *Id*. The trial court found that the terms and conditions became part of a contract between Trane and Consolidated. *Id*. at 820.

On appeal, Consolidated argued that Trane's bid proposal was an offer that did not include its terms and conditions and Consolidated then accepted the proposal by sending Trane a purchase order. *Id*. According to Consolidated, the contract was formed at that point. *Id*. Trane then faxed its "acceptance" of the

purchase order with its terms and conditions. *Id*. The court of appeals concluded that there was evidence to support the trial court's finding that the terms and conditions were attached to Trane's bid proposal and thus became part of the contract when Consolidated sent its purchase order. *Id*. at 820-21.

It is undisputed that JSW's terms and conditions were attached to the price quotation email, so unlike the situation in *Wade & Sons*, there is no fact dispute as to whether they were part of the offer. In accordance with our sister court's holding in that case, we conclude JSW's terms and conditions became part of the parties' agreement when ETC accepted the offer with its purchase order.[5] *See id*. ETC's terms and conditions were not part of the parties' agreement because, as discussed, JSW expressly limited acceptance of its price quotation to its own terms and conditions. *See* Tex. Bus. & Com. Code § 2.207(b)(1). Because JSW's terms and conditions included an arbitration agreement, the trial court did not abuse its discretion in compelling the parties to arbitrate their dispute. We overrule ETC's first issue.

## II.    Was the trial court authorized to award postjudgment interest?

In its second issue, ETC argues that the trial court should not have awarded JSW postjudgment interest that was not awarded by the arbitrator. JSW asserts that the trial court was authorized to award postjudgment interest in accordance with the Finance Code. *See* Tex. Fin. Code § 304.002 ("A money judgment of a court of

---

[5] ETC cites *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.), and *Owen v. Hendricks*, 433 S.W.2d 164, 167 (Tex. 1968), in support of its argument that JSW was required to "expressly incorporate" its terms and conditions. Both of those cases involve common law contracts and not the UCC, whereas *Wade & Sons* is a UCC case. Moreover, the *Bob Montgomery Chevrolet* case involved a signed contract and an unsigned document that one party argued was incorporated by reference into the contract. 409 S.W.3d at 189. Here, the question is whether, under the UCC, JSW's price quotation was an offer that included its terms and conditions as part of the offer because they were attached to the price quotation email.

this state on a contract that provides for interest . . . earns postjudgment interest at a rate equal to the lesser of . . . the rate specified in the contract, which may be a variable rate; or . . . 18 percent a year."). JSW in its appeal contends that the trial court awarded the wrong postjudgment interest rate. We do not reach the issue raised by JSW's appeal because we conclude that the trial court erred in awarding postjudgment interest.

A trial court has limited powers to modify an arbitrator's award. *Forged Components, Inc. v. Guzman*, 409 S.W.3d 91, 106 (Tex. App.—Houston [1st Dist.] 2013, no pet.). The Federal Arbitration Act does not expressly authorize an award of postjudgment interest when the arbitrator has not made such an award; neither does the Texas General Arbitration Act. *Gordon v. Nickerson*, No. 03-18-00228-CV, 2019 WL 2147587, at *5 (Tex. App.—Austin May 17, 2019, pet. denied) (mem. op.); *Forged Components, Inc.*, 409 S.W.3d at 106. Several of our sister courts have held that a trial court lacks authority to modify an arbitration award by adding postjudgment interest. *See, e.g.*, *Gordon*, 2019 WL 2147587, at *5; *Thomas Petroleum, Inc. v. Morris*, 355 S.W.3d 94, 99 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *Blumberg v. Bergh*, No. 2-04-138-CV, 2005 WL 1047592, at *6 (Tex. App.—Fort Worth May 5, 2005, no pet.) (mem. op.). We agree.

As to JSW's argument regarding the Finance Code, it authorizes postjudgment interest awards only as to money judgments rendered by courts. Tex. Fin. Code Ann. § 304.002 ("A money judgment *of a court of this state* . . . ." (emphasis added)). Arbitrators are not courts. *Blumberg*, 2005 WL 1047592, at *6; *see also Guerra v. L&F Distributors, LLC*, 521 S.W.3d 878, 887 (Tex. App.—San Antonio 2017, no pet.) ("[A]rbitration awards are not the same as judgments rendered by trial courts [and] they are not automatically subject to the same statutory provisions as judgments.").

16

Here, the arbitrator expressly awarded interest as follows in her modified final award: "Interest in the amount of 1 ½ % per month or the highest rate allowed by law, whichever is lower from August 1, 2018 until paid or a judgment is entered." The arbitrator initially awarded interest "from August 1, 2018 until paid" but added the language "or a judgment is entered" after ETC moved to modify the award. Accordingly, the issue of postjudgment interest was before the arbitrator, and she did not make an apparent miscalculation or mistake. JSW did not object to the arbitrator's modified award during the arbitration process.

JSW contends that this case is akin to *Baker Hughes Oilfield Operations, Inc. v. Hennig Production Co.*, 164 S.W.3d 438 (Tex. App.—Houston [14th Dist.] 2005, no pet.), in which we held that the trial court did not err in inserting a beginning date for prejudgment interest after arbitrators had awarded prejudgment interest. *Id*. at 447. But as we noted in that case, "This is not a case in which the arbitrators did not award prejudgment interest, yet a trial court modified the award to include it." *Id*. We held that "the trial court's judgment merely effectuates the arbitrators' award of interest" and "[a]s evidenced by the award, the arbitrators intended to award prejudgment interest." *Id*. at 447-48. Here, by contrast, the arbitrator initially awarded postjudgment interest but then modified her award to exclude it, so the record indicates that she did not intend to award it.

There was no basis for the trial court to award postjudgment interest. We therefore uphold the arbitrator's award and conclude that the trial court erred in awarding postjudgment interest. *See Fogal v. Stature Const., Inc.*, 294 S.W.3d 708, 722 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). We sustain ETC's second issue.

17

## *Conclusion*

Having concluded that the trial court did not abuse its discretion by ordering the parties to arbitrate their dispute, we affirm the trial court's judgment confirming the arbitration award as modified.

/s/    Frances Bourliot
Justice

Panel consists of Justices Bourliot, Zimmerer, and Spain.